IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

NATALIE CHANEY,

        Plaintiff,

v.                                                    Civil Action No. 1:13-CV-144

CAROLYN W. COLVIN,
Acting Commissioner of Social Security,

        Defendant.

## REPORT AND RECOMMENDATION

## I.  INTRODUCTION

### A. Background

On May 11, 2013, Natalie Chaney filed this action under 42 U.S.C. §§ 405(g) for judicial review of an adverse decision of the Commissioner of Social Security denying her claims for disability insurance benefits ("DIB") under Title II of the Social Security Act. 42 U.S.C. §§ 401-433.[1] The Commissioner filed her Answer on September 13, 2013.[2] Ms. Chaney then filed her Motion for Summary Judgment on October 15, 2013,[3] and the Commissioner filed her Motion for Summary Judgment on December 16, 2013.[4] The motions are now ripe for this Court's review, and for this report and recommendation.

### B. The Pleadings

1. Ms. Chaney's Motion for Summary Judgment and Memorandum in Support.

---

[1] Docket No. 1.

[2] Docket No. 4.

[3] Docket No. 7.

[4] Docket No. 12.

2. Commissioner's Motion for Summary Judgment and Memorandum in Support.

## C. Recommendation

I recommend that:

1.    Ms. Chaney's Motion for Summary Judgment be **DENIED** because the ALJ (1) performed the narrative assessment required by SSR 96-8p in formulating the RFC; (2) properly considered the opinion evidence; and (3) adequately accounted for Ms. Chaney's concentration, persistence, and pace deficits in both his hypothetical to the VE and his RFC determination.

2.    Commissioner's Motion for Summary Judgment be **GRANTED** for the reasons set forth.

## II.  FACTS

## A. Procedural History

On June 27, 2011, Ms. Chaney applied for DIB alleging an onset of disability of March 1, 2007, due to mood disorders, bunions, and arthritis of the right ankle. (R. 80, 181.) The application for benefits was initially denied on December 30, 2011, and upon reconsideration on April 10, 2012. (R. 82-86, 89-91.) Ms. Chaney requested  a hearing before an Administrative Law Judge ("ALJ"), which was held on November 29, 2012. (R. 92-93, 33-71.)  Ms. Chaney, who was represented by counsel, testified at the hearing, as did as did an impartial Vocational Expert ("VE"). (R. 33-71.) At the hearing, Ms. Chaney amended her alleged onset of disability to January 26, 2011. (R. 36.)  On December 20, 2012, the ALJ issued an unfavorable decision finding that Ms. Chaney was not disabled. (R. 13.) On January 7, 2013, Ms. Chaney appealed this decision to the Appeals Council,

which denied review of the ALJ's decision on March 26, 2013. (R. 1-4, 12.)  Ms. Chaney then timely brought her claim to this Court.

**B. Personal History**

Ms. Chaney was born January 26, 1983, making her twenty-nine years old at the time of her disability determination. She has never been married and has two young children. She lives with her long-term boyfriend who is the father of her children. Ms. Chaney quit school at the age of sixteen and received her GED in 2007. Her past work includes retail cashier, dishwasher, deli worker, warehouse assembler, and slot machine attendant. She has not worked since 2008.

**C. Medical History**

The following medical history is relevant to the issue of whether substantial evidence supports the ALJ's finding that Ms. Chaney was not under a disability.

*1. Physical Health*

In 1995, Dr. Dale Herman performed surgery to remove bunions on Ms. Chaney's right foot. (R. 447.) In 2001, Dr. Acree performed surgery to remove bunions on her left foot. (R. 447, 410.) On November 4, 2003, Ms. Chaney was seen by Dr. Knutson for right ankle pain stemming from a car accident she had a week earlier. (R. 408.) An X-ray of her right ankle revealed a small avulsion off the fibula and "a talar dome fracture that is essentially nondisplaced and involving the lateral aspect of the talar dome." (*Id.*) Dr. Knutson placed Ms. Chaney in a short leg nonweightbearing cast for four weeks. (*Id.*) Ms. Chaney was a no-show for a follow-up appointment on November 11, 2003. (*Id.*) On November 14, 2003, Ms. Chaney arrived for a follow-up appointment having removed the cast on her own, and she "was actually seen walking into the office weightbearing as tolerated. She was supposed to be nonweightbearing." (R. 409.) A physical exam showed that the

ankle was "still tender to palpation," but there was no swelling. (*Id*.) Dr. Knutson "stressed with her that she really needs to remain nonweightbearing with this injury for a period of at least four weeks" and placed another cast on her right leg. (*Id*.) Dr. Knutson directed Ms. Chaney to return in two-weeks and noted that Ms. Chaney "was seen walking to her car weightbearing as tolerated with the cast even though she was instructed not to." (*Id*.) At the next follow-up appointment on December 2, 2003, Ms. Chaney again came to the appointment "walking on the cast and the case is broken down." (*Id*.) X-rays showed the fracture was healing in good alignment. (*Id*.) Ms. Chaney was a no-show at her next follow-up appointment on December 17, 2003, and it is not clear if she ever saw Dr. Knutson again for her ankle. (*Id*.)

On February 22, 2006, Ms. Chaney was seen in the emergency room of the City Hospital in Martinsburg for pain in her lung and right upper back. (R. 360-61.) She described the pain as "sharp and at times worse when breathing." (R. 360.) A physical exam showed that her lungs were clear to auscultation and she had bilaterally equal breath sounds. (R. 361.) An exam of her back showed "tenderness to palpation over her mid thorax between approximately T-5 to T-8 and the scapula," with "no obvious muscle spasm" and "no induration." (*Id*.) Her extremities showed no edema and a chest x-ray showed no acute pulmonary disease. (*Id*.) She was assessed with musculoskeletal back pain. (*Id*.)

On June 22, 2006, Ms. Chaney was treated at the Washington County Hospital emergency room for left foot pain. (R. 264.) She complained of "a knot over the dorsal aspect of the left foot over the last two months." (*Id*.) She reported previous left foot surgery due to bunions. (*Id*.) Upon arrival, she was described as "awake, alert, does not appear to be in severe distress." (*Id*.) An examination of her left foot revealed "palpable 0.5 cm$^2$ area over the dorsal aspect of the left foot

in the region between the 3rd and 4th metatarsals. The area is tender to palpation. There is also a surgical scar overlying the 1st metatarsal from previous bunion surgery." (*Id.*) Ms. Chaney had full range of motion of the foot. (R. 265.) An x-ray revealed "bunionectomy changes with K wire in place. Sutures seen overlying the proximal 1st phalanx. There is no evidence of fracture. Soft tissue swelling seen about the lateral aspect of the foot." (R. 266.) She was diagnosed with a ganglion cyst and discharged with pain medicines and instructions to follow up with her primary care provider for referral to a foot surgeon. (R. 265.) Her condition on discharge was reported as good. (*Id.*)

On June 22, 2007, Ms. Chaney was seen in the emergency room of the City Hospital in Martinsburg for headache pain. (R. 256-57.) A physical examination revealed her to be "an extremely well-appearing, obese, young female in no obvious discomfort at all." (R. 356.) Her vital signs were all normal, she was "awake, alert, and oriented times three," and her strength was five out of five in all extremities. (*Id.*) She was prescribed Vicodin and advised to follow-up with her primary care provider. (*Id.*)

On March 24, 2009, Ms. Chaney was seen by Dr. Tressie M. Duffy for ankle and foot pain. (R. 285-88). Ms. Chaney reported that she had recently seen Dr. Herman regarding removing the wire inserted by Dr. Acree during the 2001 bunion surgery. (R. 285.) She stated that "Dr. Herman is willing to help but I haven't followed up yet." (*Id.*) She also told Dr. Duffy that she has not been able to work due to pain stemming from her 2003 talar fracture and that the pain is worse when walking or standing. She further stated that she can only walk or stand for about two hours before she has to rest or sit down. (*Id.*) A physical examination reveal that Ms. Chaney was "well-nourished, well developed, alert, in no acute distress." (R. 286.) Both lower extremities were reported as "tenderness to palpation present, no edema present, no ecchymosis-over the heel and

bunion area." (*Id.*) Her gait was described as normal and she was able to stand without difficulty. (R. 287.) Dr. Duffy assessed Ms. Chaney as having "Pain in joint, ankle and foot" and bunions. She was also referred to podiatry for a consultation. (*Id.*)

On April 6, 2009, Ms. Chaney was seen by Dr. Herman for "pain in the medial aspect of the right foot and over the dorsum of her right foot." (R. 410.) In the report of that visit, Dr. Herman states that Ms. Chaney "has had previous surgery by Dr. Acree on the left foot. I did remove the pin." (*Id.*) An X-ray showed "spurring on the head and neck of the talus consistent with an aviators injury" and "a gorrilloid navicular of the right foot with a pronated right foot consistent with an HAV deformity at an early age." (*Id.*) Dr. Herman assessed Ms. Chaney as having "posterior tibial tendonitis, insertional; left" and "spurring over the talus and beneath the extensor retinaculum causing chronic tendonitis and tendonopathy." (*Id.*) Dr. Herman advised Ms. Chaney to take over-the-counter pain medications and use an ace wrap. (*Id.*) She was also advised "that an OTC orthoses would be of some benefit although the best device would be a Mueller TPD orthoses which is a custom made device but costly and prohibitive." (*Id.*) Dr. Herman also discussed further treatment in the form of corticosteriod injections, and she was advised not to wear shoes that were too compressive. (*Id.*) Finally, Dr. Herman advised Ms. Chaney that if all other control failed, surgery was an option. (*Id.*)

Ms. Chaney saw Dr. Duffy for a follow-up visit on April 24, 2009. (R. 289-92.) She reported that she had seen Dr. Herman and had some pain relief, but that she still has pain in her right heel and left first digit. (R. 289.) A physical examination revealed no joint or limb tenderness, no edema, and no ecchymosis in the lower extremities. (R. 291.) In addition, her gait was normal and she was able to stand without difficulty. (*Id.*)

On May 28, 2009, Ms. Chaney was seen at a community health center for right ankle pain due to a bone spur. (R. 393-394.) She reported that she had been seeing Dr. Duffy, but that she could no longer afford it. (*Id.*) She was noted as having tenderness, swelling, and crepitus in her right ankle, and she was prescribed pain medication. (*Id.*)

On July 21, 2009, Ms. Chaney was seen at the Tri-State Community Health Center complaining of headaches. (R. 390-91.) She was diagnosed with tension headaches and given pain medication. (R. 391.)

On August 26, 2009, Ms. Chaney was seen in the emergency room of the City Hospital in Martinsburg complaining of neck pain after being rear ended by a tractor trailer. (R. 332-33, 345.) She reported that she had been "a restrained passenger in a vehicle that had rear end impact at a low rate of speed by a tractor trailer," but that she did not strike her head or have any loss of consciousness. (R. 332.) She ranked her discomfort as 4 out of 10 and described it as "aching and pulling in nature." (*Id.*) She denied chest pain, shortness of breath, numbness, tingling, strength changes in the arms, mid or lower back pain, flank pain, abdominal pain, and extremity injury or pain. (*Id.*) She denied any injury or pain to her lower extremities. (*Id.*) A physical examination showed that her extremities were all moving well without difficulty. (R. 333.) A CT scan of the cervical spine showed "no evidence of a cervical spine fracture" and "grossly normal" cervical spine alignment. (R. 345.) Ms. Chaney was diagnosed with a cervical strain and prescribed pain medication. (R. 333.)

On April 28, 2011, Ms. Chaney was seen in the emergency department for a swollen and painful left calf. (R. 313-19, 343, 509-10.) She reported being stung on the foot and experiencing pain and swelling the next day. (R. 318.) She stated that she had "been walking around a lot and

initially contributed the pain to that." (*Id*.) An examination of the left lower extremity revealed:

> no asymmetry in the circumference between the left and right calves. There is really no tenderness with palpation in the posterior calf, although the patient localizes her pain to the mid aspect of the calf. There are no skin changes, including erythema or induration. The foot examination reveals no lesions in the area where she localizes this bite, no soft tissue swelling. The patient has palpable radial and ulnar pulses. The foot itself is warm.

(R. 319.) However, an ultrasound showed no evidence of deep venous thrombosis. (R. 319, 343.)

On December 8, 2011, Dr. Robert F. Webb examined Ms. Chaney and prepared a consultative examination report. (R. 447-49.) Ms. Chaney reported that "her feet have always bothered her and the left has been more painful that the right more recently." (R. 447.) She stated that she can be on her feet for at most one to two hours at a time. (*Id*.) She noted that she fractured her right ankle in 2003 and that her right ankle has bother her ever since. (*Id*.) She claimed that "she has been told that she has arthritis and a bone spur and that the fracture was of the talus...The most she can walk would be to go through Wal-Mart or to go less than a block to get to her mailbox and back. Occasionally her ankle will hurt in the cold weather at rest." (*Id*.) Ms. Chaney reported that she tries to exercise by walking through the mall and playing with her two children. (R. 448.) She also noted that she had a history of pain medication addiction. (*Id*.)

A physical examination showed that "she was able to stand up from the chair with her arms held out. Her young son was with her for the exam today." (R. 448.) An exam of her extremities revealed the following:

> She had slight warmth of the right ankle. Her ankle joints looked equal. She had swelling of both big toe MP joint areas with scars from previous surgery. The bunion of the left medial MP joint area was more prominent and sore and swollen than the right. She had good DP pulses. The left ankle was slightly sore to palpation. She had no pain with range of motion of the ankles. She held both her feet

everted. She had good 2+ knee and ankle reflexes.

(R. 448-49.) She could "squat fully and could walk on her heels and toes." She was "tender to palpation of the left big toe MP joint." (R. 449.) On range of motion testing, "she had 5 degrees right, 10 degrees left ankle dorsiflexion, 20 degrees bilateral plantar flexion, [and] good strength all over except minimal weakness of the feet-plantar and dorisflexion." (*Id.*) Dr. Webb requested an x-ray of Ms. Chaney's right ankle. (R. 451.) The x-ray revealed "no cortical defects throughout the bony structures. No focal soft tissue is noted. The bony alignment is within normal limits. There is no evidence of joint effusion. There is no significant interval change compared to the prior study. Normal study; no radiographic evidence of acute fracture or subluxation at this time." (*Id.*) Dr. Webb noted the following impressions: (1) History of chronic pain in both feet with bunions bilaterally; (2) Old history of right ankle fracture with posttraumatic arthritis and history of tendinopathy; (3) History of narcotic abuse; (4) Past history of heroin use; (5) Tobacco abuse; (6) History of chronic depression with mood swings, and diagnosis earlier this year of bipolar disorder; (7) Chronic headaches; (8) Obesity. (R. 449).

On January 14, 2012, Ms. Chaney was seen in the City Hospital emergency room complaining of abdominal pain. (R. 506-08, 517.) She also reported "vague headaches." (R. 506.) She stated that she was "concerned because she was recently diagnosed with mononucleosis...and was told that her spleen and liver were enlarged at that time." (*Id.*) A physical examination showed "vague right-sided upper quadrant tenderness" of the abdomen, but the examining physician stated that "it is difficult for me to appreciate a definite hepatomegaly or splenomegaly here secondary to the patient's body habitus." (R. 507.) Her extremities were noted as being "atraumatic without any significant peripheral edema." (*Id.*)

On February 22, 2012, Ms. Chaney was seen at the City Hospital emergency room complaining of left sided breast/chest pain. (R. 497-505, 516). A CT scan of the chest showed "no evidence of pulmonary embolism. Lungs are clear. Tiny 3 x 3 mm nodule is present in the right upper lobe. No effusions. There is no evidence of enlarged nodes or masses." (R. 516.) Ms. Chaney was diagnosed with costochondritis and discharged. (R. 501.)

On July 25, 2012, Ms. Chaney started regular visits to the Foot & Ankle Center. (R. 571-77). An examination showed that the bilateral lower extremities were "warm, dry, normal elasticity, normal turgor, no lesions, no wounds, no rash." (R. 577.) She had no edema in her lower extremities. (*Id*.) Both of the lower extremities had normal sensation and normal reflexes. (*Id*.) X-rays showed "deformed talus on the right with some possible old impaction injury...there is degenerative arthritis of right ankle joint and left first MPJ...there is recurrent hallux valgus on the left." (*Id*.) Dr. Lonas diagnosed Ms. Chaney with hallux rigitus, planter fascitis, and primary localized osteoarthrosis of the ankle and foot. (*Id*.) He recommended "soaks, ice, stretching exercises," and prescribed custom orthotics. (*Id*.) He also dispensed an ankle stabilizer for the right ankle and recommended that she consult Dr. Ramdass regarding surgical options, including possible right ankle implant. (*Id*.)

Ms. Chaney was seen by Dr. Ramdass on August 6, 2012 for a surgery consultation. (R. 578-79). She stated that she had been using the prescribed brace, but that she "still has activity related pain." (R. 578.) A musculoskeletal exam revealed "edema of the right foot and ankle with hyperkeratotis of the first mpj taxity of the right ankle with clicking tenderness on palpation of the deltoid anterior medial gutter and lateral aspect increased inversion noted bunion deformity with decreased range of motion abducted hallux no trophic changes negative Tinel sign." (R. 579.) Dr. Ramdass diagnosed her with hallux vaigus, ankle/foot instability, and degenerative arthritis of the

ankle or foot. (*Id.*) Dr. Ramdass discussed treatment options with Ms. Chaney including "risks, benefits, alternatives to continued conservative care consisting of bracing, injection therapy, immobilization, anti-inflammatory versus surgical management consisting of ankle arthroscopy, ankle stabilization, and repair of recurrent bunion." (*Id.*) Dr. Ramdass also performed a diagnostic intra-articular injection of lidocaine, marcaine, dexamethasone phosphate, and depomedrol, which gave Ms. Chaney "some immediate relief." (*Id.*) On August 20, 2012, Ms. Chaney returned to the podiatry clinic for a follow-up examination with Dr. Ramdass. (R. 580-81.) She reported that the injection "helped some along with the bracing however still complains of continued pain, weakness, and giving way. She also complains of painful recurrent bunion and would like to proceed with surgery as previously discussed since its getting worse." (R. 580.)

On September 21, 2012, Dr. Ramdass performed a right ankle arthroscopy with synovcotomy and exostectomy, a right lateral ankle stabilization with split tendon transfer and bone anchors, and a right revision bunionectomy with osteotomy with screw fixation and removal of retained hardware. (R. 560-67). On September 24, 2012, Ms. Chaney was seen for a postoperative evaluation. (R. 584-85). She complained of some pain and discomfort, but denied calf pain. (R. 584.) Her incisions were "dry, clean, intact with sutures and straps in place." (R. 585). Her alignment was improvement and there was no erythema, drainage, or signs of infection, although there was some edema. (*Id.*) Dr. Ramdass applied a short-leg cast and advised her to follow-up in two weeks. (*Id.*) On September 26, 2012, Ms. Chaney returned to the clinic requesting that the cast be removed because of tightness and pressure. (R. 586-87.) An exam showed some pain in palpation of the right calf and some edema in the right calf, but the incisions appeared well coapted. (R. 587.) Dr. Lonas removed the cast, changed the sterile dressing, and dispensed an equalizer. (*Id.*) On October 8, 2012, Ms. Chaney had

her final visit with Dr. Ramdass. She complained of minimal pain, but denied any calf pain. (R. 588.) She was able to move her ankle up and down with good stability and improved alignment and increased range of motion. (R. 589.) Dr. Ramdass removed the sutures and staples and applied an equalizer boot. (*Id.*)

*2. Mental Health*

On March 3, 2008, Ms. Chaney was seen by Dr. Jeffrey Kellogg for symptoms of depression. (R. 282-83). She reported that she started to have a depressed mood during her recent pregnancy and that just after delivery six weeks prior, she began having worsening mood problems. (R. 282.) She was prescribed Lexapro by her gynecologist, but her medical card would not pay for the medication. (*Id.*) Dr. Kellogg diagnosed her with depression and prescribed fluoxetine. (R. 282-83.) On March 4, 2009, Ms. Chaney was see at the Tri-State Community Health Center for depression. (R. 397-98). She requested, and was prescribed, fluoxetine. (R. 398.)

On December 4, 2009, Ms. Chaney underwent an initial evaluation for behavioral health services at Shenandoah Valley due to anxiety and anger issues. (R. 420-28.) During the evaluation, Ms. Chaney reported that she "quits each job or gets fired for absences [because] she gets bored or angry at the public." (R. 423.) She reported no medical problems expect for "occasional spikes in BP when angry," a mild cholesterol problem, and ovarian cysts. (R. 424.) On a mental status exam, Ms. Chaney was alert and oriented to time, person, and place. (R. 426.) Her appearance was casual and her attitude toward the examiner was cooperative. (*Id.*) However, she also had some crying jags, and her affect was anxious/panicky, irritable, depressed, fearful, and suspicious. (*Id.*) Her thought process and speech was logical, but she reported angry rages lasting one to two days. (*Id.*) She reported no hallucinations or delusions, but did report compulsive cleaning and an anti-clutter

obsession.

A cognitive exam revealed that Ms. Chaney's short-term memory was deficient and that she had poor concentration and judgment and fair insight and general fund of information. (R. 426.) She had no intellectual deficits. (*Id.*) She reported her symptoms as weight loss, hopelessness, helplessness, lethargy, decreased libido, racing thoughts, worthlessness, guilt, palpitations, appetite disturbance, and sleep disturbance. (R. 427.) She also reported that she "threatens self harm but this...is manipulative." (*Id.*) As a result of the evaluation, Ms. Chaney's Global Assessment of Functioning ("GAF") score was determined to be 58, and she was diagnosed with polysubstance dependance, mood disorder, rule-out bipolar disorder, anxiety disorder, rule-out panic disorder, rule-out obsessive-compulsive disorder, and rule-out post-traumatic stress disorder. (R. 428.) She was referred to psychiatrist Joseph Jurand, M.D., for psycho-pharmaceutical management and therapist, T. Hanes, for individual therapy.

On January 19, 2010, Ms. Chaney started regular medication check sessions with Dr. Jurand. (R. 438.) He placed her on Navane. (R. 326, 438). On January 21, 2010, Ms. Chaney presented to the City Hospital Emergency Department complaining of "depressive illness." (R. 326-27, 350.) She reported that she saw Dr. Jurand the day before and was placed on Navane, but that "she is not feeling any better," and that "she has been crying all day." (R. 326.) On a psychiatric exam, Ms. Chaney maintained good eye contact and "appear[ed] fairly calm." (*Id.*) She stated that "she is indifferent to suicide, but it is unclear as to whether she would actually act upon herself. At one point she denies it and then at another point she feels unsafe." (*Id.*) Ms. Chaney indicated to the emergency room doctors that she desired to be admitted to the hospital, but she was ultimately found to have "no particular need for admission. She has been evaluated by psych services and they do feel

the patient can be safely discharged, and then followed up through East Ridge tomorrow." (R. 327.) Ms. Chaney was discharged to home for further outpatient care. (*Id*.)

The next day, January 22, 2010, Ms. Chaney saw Dr. Jurand and reported being "very miserable." Dr. Jurand noted that she was "very irritable, wants immediate relief." (R. 437.) Ms. Chaney's next appointment with Dr. Jurand was on February 12, 2010. (R. 435.) She reported that she had stopped taking the Navane on her own because it made her nervous, jittery, and restless. (*Id*.) Ms. Chaney reported that her mood was better, but that she still could not concentrate. She requested medication for ADHD. (*Id*.)

On February 22, 2010, Ms. Chaney was seen in the City Hospital emergency room complaining of being suicidal. (R. 323-25, 348-49.) She reported that she was being treated for depression by Dr. Jurand, but that her symptoms "have been particularly bad over the last two weeks or so." (R. 323.) She admitted to "thinking about killing herself very frequently, but she denies having a plan." (*Id*.) Ms. Chaney was transferred to Chestnut Ridge Hospital for inpatient psychiatric care. (R. 293-307, 324.) At Chestnut Ridge, a mental status examination revealed that Ms. Chaney was alert and oriented to time, place and person. (R. 296.) She was pleasant and cooperative, her motor skills and speech were normal, and her attention was adequate. (*Id*.) She had fair eye contact and normal memory, and her thought process was linear and goal directed. (*Id*.) Her fund of knowledge was average, her conceptual ability was abstract, and her insight and judgment were fair. (*Id*.) She was assessed as having a mood disorder and opioid dependence. Her GAF was 40 on admission. (R. 297.) She was admitted for further evaluation. (*Id*.) After admission, Ms. Chaney was started on Wellbutrin and attended therapy sessions. Her mood "improved significantly and she as deemed stable for discharge with outpatient followup." (R. 299.) She was discharged on

February 25, 2010, with instructions for follow-up outpatient care. (*Id*.)

On March 10, 2010, Ms. Chaney saw Dr. Jurand. (R. 433.) She reported that the Wellbutrin seemed to be helping with the depression, but that she still has issues focusing and concentrating. (*Id*.) Dr. Jurand changed her removed mood disorder from the diagnoses and added ADHD. (*Id*.) On March 17, 2010, Ms. Chaney reported to Dr. Jurand that her mood was improved, and requested a new ADHD medication. (R. 432.) On March 29, 2010, a progress note indicates that Ms. Chaney "again does not come for scheduled appt. and [she] has a total of 6 N/S– 2 for Dr. Jurand, 2 for referring provider, and two for recorder. Rec. that she be put on same-day-sick for recorder." (R. 434.) The last reported visit with Dr. Jurand was on May 25, 2010, where Ms. Chaney reported that the medication was not working, and her "anxiety and nerves are getting worse." (R. 431.) Ms. Chaney missed another appointment on June1, 2010. (R. 434.)

Ms. Chaney was formally discharged as a patient from Shenandoah Valley on December 28, 2010. (R. 419.) Upon discharge, it was noted that she had two individual therapy sessions, five psychopharm. management sessions, and seven no shows. (*Id*.) Her separation status was listed as "Admin. Status (no contact for 90 days)." (*Id*.) Her diagnosis at discharge was mood disorder and ADHD. (*Id*.)

On January 28, 2011, Ms. Chaney was seen in the City Hospital emergency room for a drug problem. (R. 320-322, 511-514.) A psychiatric exam showed that she was "awake, alert, makes good eye contact, says she feels depressed but is not suicidal...tearful at times...admits to substance abuse." (R. 321.) A physical exam was normal, and her extremities were noted as having "good range of motion, no clubbing or cyanosis." (R. 321.) A crisis worker determined that Ms. Chaney did not meet the criteria for admission to the hospital, and Ms. Chaney was discharged with a

prescription for lorazepam and a referral to outpatient treatment. (*Id.*)

On December 1, 2011, state consultive psychologist Harold D. Slaughter, M.S., conducted a clinical interview and a mental status examination of Ms. Chaney. (R. 441-45.) She arrived on time for the evaluation and brought her 4 year-old son. (R. 441.) She was well-groomed, and her posture and gait were normal. (*Id.*) Ms. Chaney reported that her behavioral problems started when she was around 12 or 13 years-old. (*Id.*) She reported being placed for several months at Elkins Children's Home due to "adolescent antisocial type behavior, truancy, being oppositional defiant." (R. 442.) Ms. Chaney related to Dr. Slaughter that "the bipolar disorder may have never been officially diagnosed, she said that her mother told that she thinks that is what she has and that is what she needs to be treated for." (R. 442.) She stated that "she is not able to work because her feet hurt and she gets upset easily and yells at people." (*Id.*) Dr. Slaughter described Ms. Chaney's presenting symptoms as follows:

> [S]he scream[s] at people, she is never happy, and cr[ies] all day long. She also admits to anger issues, impulsivity, and chronic worry. She said when she worries a lot she has anxiety attacks, which result in difficulty breathing. She did not report any classic symptoms of manic episodes. What she did report was that she stays up all night, but this is two to three times a week and then she will sleep the next day. She reports no current suicidal ideation, although she admits to a history of making some threats in the past when she was a teenager. She has never made any suicidal gesture. Sleep is disturbed due to racing thoughts and worry.

(R. 442.)

A mental status examination revealed the following:

> <u>Appearance</u>: She was appropriately dressed in jeans and a T-shirt, well-groomed. <u>Attitude/Behavior</u>: Cooperative. <u>Speech</u>: Without impediment. <u>Orientation</u>: Oriented in all spheres. <u>Mood</u>: Angry. <u>Affect</u>: Broad. <u>Thought Process</u>: Within normal limits. <u>Thought Content</u>: Coherent and relevant to topic. <u>Perceptual</u>: None reported.

> Insight: Poor. Psychomotor Behavior: Within normal limits.
> Judgment: Average, based on clinical observation.
> Suicidal/Homicidal Ideation: Neither reported by claimant, at this
> time. Immediate Memory: Within normal limits. Recent Memory:
> Moderately deficient, recalled two of four words after time delay.
> Remote Memory: Within normal limits. Concentration: Average,
> Digit Span scaled score equal 8. Persistence: Within normal limits.
> Pace: Not measured, no test given.

(R. 444.) Dr. Slaughter diagnosed Ms. Chaney with Oppositional Defiant Disorder, Intermittent

Explosive Disorder and Opioid Dependence, Early Full Remission. (*Id.*) He noted that "the

oppositional diagnosis is based on her admission of having anger problems, screaming at people,

and becoming very quickly upset. The Intermittent Explosive Disorder is likewise based on her

anger issues. Opioid Dependence is based on her admission of abusing pain killers up until her

entrance into the Suboxone Clinic in February 2011." (*Id.*) Ms. Chaney's prognosis was "fair with

treatment." (R. 445.)

Beginning in January 2012, Ms. Chaney saw Ramsay Farah, M.D. for outpatient medication

management treatment for her mental impairments.[5] The records documenting Ms. Chaney's visits

with Dr. Farah are mostly illegible. (R. 529-53.) However, Ms. Chaney did see Dr. Farah monthly

until September 2012.

*3. Opinion Evidence*

a. Physical Health

On December 22, 2011, James Egnor, M.D., completed a Physical RFC Assessment. (R. 452-

59.) Dr. Egnor found Ms. Chaney to have the following exertional limitations: (1) occasionally lift

---

[5]Although the first reported visit with Dr. Farah appears to be on January 14, 2012, the medical records
from Dr. Farah's office include lab work dated August 19, 2011, which indicates that Ms. Chaney may have started
seeing Dr. Farah earlier. Additionally, during the December 2011 clinical interview, Ms. Chaney reported to Dr.
Slaugher that Dr. Farah prescribed lithium three months prior. (R. 443.)

and/or carry 50 pounds; (2) frequently lift and/or carry 25 pounds; (3) stand and/or walk for a total of about 6 hours in an 8-hour workday; (4) sit for a total of about 6 hours in an 8-hour workday; (5) push and/or pull unlimited, other than as shown for lift and/or carry. (R. 453.) Dr. Egnor found that she had no postural, manipulative, visual, or communicative limitations. (R. 454-56.) He found that Ms. Chaney had the following environmental limitations: (1) extreme cold– avoid concentrated exposure; (2) extreme heat– unlimited; (3) wetness– unlimited; (4) humidity– unlimited; (5) noise– unlimited; (6) vibration– avoid concentrated exposure; (7) fumes, odors, dusts, gases, poor ventilation, etc.– unlimited; (8) hazards– avoid concentrated exposure. (R. 456.) Dr. Egnor concluded that Ms. Chaney's complaints were "not fully credible, the RFC is reduced to do a full range of medium work with some environmental limitations as noted." (R. 457.) On April 6, 2012, Fulvio Franyutti, M.D. prepared a medical evaluation/case analysis affirmed Dr. Egnor's RFC assessment as written. (R. 524.)

Finally, Dr. Ramdass completed a Medical and Functional Capacity Assessment. (R. 555-556). The report is undated, but appears to have been completed shortly after Ms. Chaney's foot surgery. Dr. Ramdass noted that Ms. Chaney suffers from pain when placing weight on lower extremity/foot, uneven/antalgic gait, inability to bear weight on that extremity/foot alone, and recurrent episodes of severe pain requiring rest and prolonged elevation. (R. 555.) Dr. Ramdass opined that Ms. Chaney could stand and walk for less than thirty minutes and sit for 1-2 hours until experiencing interruption due to pain. (R. 556.) Dr. Ramdass also noted that Ms. Chaney would be able to alternate between sitting and standing on a continuous basis throughout an eight hour weekday with customary breaks without experiencing interruption due to pain. (*Id.*) Finally, in the section asking how many total hours Ms. Chaney could stand, walk, or sit during an eight hour workday, Dr. Ramdass did not answer, but instead wrote: "Miss Chaney had surgery on her right ankle and foot on 9/11 and is recuperating home. I will be better able to assess her functional

capacity...." (R. 556.)

b. Mental Health

On December 30, 2011, Karl G. Hursey prepared a Psychiatric Review Technique. (R. 460-73.) Dr. Hursey found that Ms. Chaney had no severe mental impairments. (R. 460.) Specifically, he found that Ms. Chaney had several medically determinable mental impairments, she had only mild restrictions in activities of daily living, difficulties in maintaining social functioning, and difficulties in maintaining concentration, persistence, or pace. (R. 470.) Dr. Hursey further found that Ms. Chaney's subjective allegations were only partially credible and only partially consistent with the objective medical evidence. Dr. Hursey opined that Ms. Chaney struggles to manage basic social interactions or relationships effectively, but that her cognitive functioning was adequate for routine functioning in everyday settings. He concluded that Ms. Chaney "shows functional limitations due to mental/emotional factors, however these impairments do not meet or equal the DDS requirements for the listing." (R. 472.) On April 6, 2012, Dr. Bob Marinelli reviewed the medical evidence and Dr. Hursey's assessment, and he concluded that the assessment was affirmed as written. (R. 523.)

Finally, on November 29, 2012, Dr. Farah completed a Medical Source Statement. (R 590-92.) In the report, Dr. Farah opined that independent of alcoholism or drug addiction, Ms. Chaney had (1) some loss of ability to apply commonsense understanding to carry out instructions furnished in written, oral, or diagrammatic form and to deal with problems involving several concrete variables in or from standardized solutions; (2) no significant loss of ability to apply commonsense understanding to carry out detailed but uninvolved written or oral instructions and to deal with problems involving a few concrete variables in or from standardized situations; (3) some loss of

19

ability to apply commonsense understanding to carry out simple one or two-step instructions and to deal with standardized situations with occasional or no variables in or from these situations encountered on the job; (4) no significant loss of ability to carry out very short and simple instructions; (5) serious loss of ability to maintain attention and concentration for extended periods; (6) serious loss of ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; (7) extreme loss of ability to sustain ordinary routine without special supervision; (8) serious loss of ability to work in coordination with or proximity to others without being unduly distracted by them; (9) extreme loss of ability to complete a normal work week without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; (10) serious loss of ability to interact appropriately with the general public; (11) no significant loss of ability to ask simple questions or request assistance; (12) no significant loss of ability to accept instructions and respond appropriately to criticism from supervisors; (13) no significant loss of ability to get along with coworkers or peers without unduly distracting them or exhibiting behavioral extremes; (14) some loss of ability to respond appropriately to changes in a routine work setting; and (15) serious loss of ability to cope with normal work stresses without exacerbating psychologically based symptoms. (R. 590-91.) Dr. Farah left blank the box calling for an explanation of his assessments. (R. 591).

## D. Testimonial Evidence

Testimony was taken at the hearing held on November 29, 2012. The following portions of the testimony are relevant to the disposition of the case:     As to her mental state, Ms. Chaney testified that she has almost daily crying spells and that she harbors suicidal thoughts about twice

a month. (R. 44.) Ms. Chaney also testified that she has memory problems. Specifically, she stated "if I walk into a room, I'll forget something. I forget what I needed. That's pretty much it. I lose stuff a good bit." (R. 45.) When asked if she attributed that to the medication or to a lifelong problem, Ms. Chaney replied, "I've always been like that, been like that for the longest time." (*Id.*)

Ms. Chaney testified as follows about her exertional limitations:

> Q. Okay. A year ago, did you have any problem sitting, standing, or walking?
>
> A. Standing for long periods of time, and walking.
>
> Q. Okay, so let's talk about that. A year ago, how long could you stand?
> A. Probably for about an hour or two, and then I'd have to sit.
>
> Q. A year ago, how long could you walk?
>
> A. How far could I walk?
>
> Q. How long could you walk?
>
> A. Not too long.
>
> Q. You're in a store?
>
> A. Probably for like an hour or something.
>
> Q. All right. In terms of lifting and carrying, a year ago you had a three-year old. Could you pick him from the couch and put him to bed?
>
> A. No, I don't pick him up. Todd does.
>
> Q. How much could you lift and carry a year ago?
>
> A. Probably about 20 pounds.

(R. 46-47.)

As to her past work experience, Ms. Chaney testified as follows:

21

Q. What happened with the dishwasher job?

A. They just didn't like me. They let me go. I mean, I wasn't there that long. I was only there, like, three weeks.

Q. Why didn't they like you?

A. They said I wasn't fast enough, so they let me go.

Q. Too slow, okay. So, it wasn't conflict with bosses?

A. Not that I know of.

Q. Okay, slot machine attendant. What happened with that job?

A. I didn't get along with a couple people there.

Q. Did you quit or were you let go?

A. They let me go.

Q. Assembly work at the factory in 2007. What happened?

A. I was having trouble with one of the tubs, and I'd asked them to help me because I couldn't finish it right, and he wouldn't come over and help, so I took and I flipped the tub over.

Q. Well, so, did they let you go? Did you quit? Did they fire you, what?

A. They let me go a couple weeks later.

Q. How about deli clerk at a grocery? What happened there?

A. I got mad and walked out because the other person wouldn't help me.

Q. The assembly work at the factory in 2004. What happened with that?

A. I couldn't lift the-they did siding, and I couldn't lift it. It was big siding and it was too heavy, and I accidently dropped it. The girl had yelled at me, I got upset, and after I went to lunch, I didn't come back.

(R. 53-54.)

After Ms. Chaney's testimony, Vocational Expert, Dr. Ryan, testified. First, he classified all of Ms. Chaney's past work as light and unskilled. Next, the ALJ presented the following hypothetical:

> Okay, younger individual, has a GED, work history as described. Without regard to testimony, the DDS gave, well, actually, they had a medium, they also had a light. But out of deference to her current situation, let's reduce this individual to sedentary, with the following limitations. No heights, few steps, no use of hazardous or moving machinery...minimal exposure to environmental irritants or temperature extremes, no heights, few steps, no use of hazardous machinery, can understand, remember, and carry out simple instructions. These jobs are goal-oriented jobs with minimal changes in the work setting, minimal interactions with others, money handling would not be an essential feature of the job. These jobs do not involve the sale or distribution of pharmacological products.

(R. 64-65.) The VE testified that several jobs existed in the national and local economy that a person with the above described limitations could do. (R. 65-66.) The VE also noted that his testimony was consistent with the DOT. Next, the ALJ asked the VE to imagine an individual with more limitations as follows:

> Q. Now, I'll factor in the claimant's testimony. I'm going to ask you to disregard the use of a boot at the present time because I don't have a duration on that. I can't project that it will be disabling for a continuous period of a year or longer. Her testimony reflects that– well, you heard her testimony regarding these jobs. She was let go. Some were being too slow, some were conflicts with others. Three weeks– significant is, three weeks out of the month she's laying in bed to the point where she's not attendant to the children. The boyfriend takes over with cooking chores at night. She's had four or five psychiatric hospitalizations in the past. She still experiences suicidal thoughts once every two weeks or so and anxiety attacks three or four times a week, lasting one to two hours. She talks about sleep deprivation and waking up. She goes through manic phases. She cycles about every three weeks. This is notwithstanding the use of psychotropic medications. She also experiences sleepiness. Given the testimony as credible, what limitations– what impact, if any, would it have on the jobs you mentioned?

A. Your honor, the two areas of impact, obviously, would be that of absenteeism, which would be excessive based on the limitations presented, and by that, I mean more than two days per month. This, in and of itself, would render the individual not employable. The other report of the individual being slow on the job, etc., as well as the interference in the conflicts with other works and the sleeping during the day, this area would be production. I maintain that when an individual is functioning at 80 percent or less, when compared to those doing the same or similar tasks, they would not be employable.

(R. 66-67.)

## III. ALJ FINDINGS

In determining whether Ms. Chaney was disabled, the ALJ followed the five-step sequential evaluation process set forth in 20 C.F.R. § 404.1520. At step one, the ALJ found that Ms. Chaney had not engaged in substantial gainful activity since January 26, 2011. At step two, the ALJ found that she had the following severe impairments: bilateral bunions, traumatic arthritis of the right ankle, lung nodule, obesity, mood disorder, intermittent explosive disorder, and oppositional defiant disorder. The ALJ found that the following impairments appearing in Ms. Chaney medical records were not severe: headaches, back and hip pain, and substance abuse. At the third step, the ALJ found that none of Ms. Chaney's impairments meet or medically equal the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. In order to consider step four of the process, the ALJ determined that Ms. Chaney now has the following RFC:

to perform sedentary work as defined in 20 CFR 404.1567(a) except that she is limited to performing work involving few steps and no heights or use of hazardous and moving machinery. She can have minimal exposure to environmental irritants or temperature extremes. She is capable of performing entry level or unskilled positions, and can understand, remember, and carry out simple instructions. She is able to perform goal-oriented jobs with minimal changes in the work setting where money handling is not an essential feature of the job. She is able to have minimal

> interaction with others. She is unable to perform work involving
> the sale or distribution of pharmacological products.

In step four, the ALJ found that Ms. Chaney was unable to perform any of her past relevant work because the requirements of her past relevant work exceed her RFC. Finally, in step five, the ALJ found that based on Ms. Chaney's age, education, work experience, and RFC, she is cable of making an adjustment to work that exists in significant numbers in the national economy. Accordingly, the ALJ found that Ms. Chaney was not disabled.

## IV.  THE MOTIONS FOR SUMMARY JUDGMENT

### A. Contentions of the Parties

Ms. Chaney contends that the ALJ's RFC assessment is not supported by substantial evidence and is erroneous as a matter of law. Specifically, she argues that the ALJ (1) failed to properly conduct a function-by-function analysis in determining her RFC as required by Social Security Ruling (SSR) 96–8p; (2) did not properly evaluate the opinions of her treating physicians; and (3) failed to include any limitations upon concentration, persistence, or pace in the RFC determination despite finding that she has moderate difficulties in those areas. The Commissioner contends Ms. Chaney's RFC is supported by substantial evidence. Specifically, she argues that the ALJ (1) fully complied with SSR 96-8p in formulating and discussing Ms. Chaney's RFC; (2) properly evaluated all medical opinions; and (3) accounted for all of Ms. Chaney's mental limitations in the RFC.

### B. The Standards

#### 1. Summary Judgment

Summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show there is no genuine issue as to material

fact and the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The party seeking summary judgment bears the initial burden of showing the absence of any issues of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). All inferences must be viewed in the light most favorable to the party opposing the motion. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). However, "a party opposing a properly supported motion for summary judgment may not rest upon mere allegations or denials of [the] pleading, but...must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986).

*2. Judicial Review*

This Court's review of the ALJ's decision is limited to determining whether the decision is supported by "substantial evidence." 42 U.S.C. §§ 405(g), 1383(c)(3). "Substantial evidence" is "more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). "Substantial evidence" is not a "large or considerable amount of evidence, but rather 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Pierce v. Underwood*, 487 U.S. 552, 664-65 (1988); *see also Richardson v. Perales*, 402 U.S. 389, 401 (1971). The decision before the Court is "not whether the Claimant is disabled, but whether the ALJ's finding of no disability is supported by substantial evidence." *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (citing *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 2001)). The ALJ's decision must be upheld if it is supported by "substantial evidence." 42 U.S.C. §§ 405(g), 1383(c)(3).

## C. Discussion

*1. Whether the ALJ Erred in Assessing Ms. Chaney's RFC?*

Ms. Chaney first argues that the RFC assessment is deficient because the ALJ failed to set forth a narrative discussion describing how the evidence supports each conclusion in the RFC, as required by SSR 96-8p.[6] Thus, according to Ms. Chaney, the ALJ's RFC assessment "fails to be supported by substantial evidence, and defies review." The Commissioner asserts, on the other hand, that "the ALJ considered all of the evidence in determining Plaintiff's RFC," and that "the ALJ's discussion of Plaintiff's examination findings and clinical test results, coupled with [his] finding that Plaintiff could perform a range of sedentary work, satisfies the mandate of SSR 96-8p." For the reasons set forth below, the undersigned agrees with the Commissioner that Ms. Chaney's argument lacks merit.

"In making an RFC finding, the ALJ is under an obligation to 'include a narrative discussion describing how the evidence supports each conclusion, *citing specific medical facts* and non-medical evidence.'" *Lehman v. Astrue*, 931 F.Supp.2d 682, 695 (D.Md.2013) (alteration in original) (quoting SSR 96–8p). "While the precise medical evidence relied on for every specific limitation need not be discussed directly in the actual RFC finding, the Court must not be required to speculate as to the bases for the findings." *Vandervort v. Astrue*, 2013 WL 508987, at *2 (D.Md. Feb. 11, 2013).

Here, the ALJ's RFC assessment, which spans more than four, single-spaced pages, thoroughly details Ms. Chaney's subjective symptoms, her activities of daily living, the hearing testimony, the objective medical records, and the opinion evidence. (R. 21-26.) Based on this detailed discussion of the record evidence, the Court finds support for the ALJ's RFC findings within his decision. For example, Ms. Chaney states that the ALJ "failed to explain how he arrived

---

[6]SSR 96-8p requires that an RFC assessment "must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts ... and nonmedical evidence ... The adjudicator must also explain how any material inconsistencies or ambiguities in the evidence in the case record were considered and resolved." SSR 96-8p, 1996 WL 374184 (July 2, 1996), at *2.

at the conclusion that the Plaintiff was limited to sedentary work [and] did not explain the evidence upon which he relied to determine that the Plaintiff was limited to performing work involving few steps." However, the ALJ very carefully outlined the medical evidence "support[ing] the limitations reflected in the residual functional capacity," including the treatment records regarding Ms. Chaney's bilateral bunions and traumatic arthritis of the right ankle, the report of the consultative examiner, and the opinion evidence relating to Ms. Chaney's physical limitations and capabilities relating to her foot and ankle pain. In addition, the ALJ cited Ms. Chaney's testimony regarding difficulty "lifting, squatting, bending, standing, reaching, walking, sitting, kneeling, climbing stairs," and noted that she currently wears a boot on her right foot following surgery.

Similarly, Ms. Chaney asserts that the ALJ "did not explain the evidence upon which he relied to determine that the Plaintiff was precluded from work around heights or use of hazardous and moving machinery, and could have only minimal exposure to environmental irritants or temperature extremes." However, the ALJ very clearly cited to the physical RFC assessment done by Dr. Egnor, which opines that Ms. Chaney should avoid concentrated exposure to heights, hazards, and extreme temperatures, as well as to other medical evidence and Ms. Chaney's hearing testimony indicating that even more limitations were warranted.

Ms. Chaney's argument consists mostly of boilerplate excerpts from Social Security regulations, and is devoid of any analysis of how a more detailed assessment might have resulted in a different outcome. As one district court in the Fourth Circuit put it, Ms. Chaney, "presents a continuously recycled argument that this Court has rejected many times, suggesting that the ALJ failed to provide a function-by-function narrative discussion of her RFC." *Porter v. Colvin*, 2014 WL 1276149 n. 7 (D. Md. Mar. 26, 2014) (collecting cases); *see also Mills v. Astrue,* 2:11–CV–65,

2012 WL 2030093, at *16 (N.D.W.Va. Apr. 9, 2012) (rejecting a similar argument). She does not contend that the RFC incorrectly describes her functional capacities, nor does she assert that additional limitations should have been found based on the evidence. Contrary to her assertions, the Court is not left to guess at the basis for the ALJ's RFC findings–it is clear from the very through discussion in the ALJ's opinion. Accordingly, the undersigned finds that the ALJ performed the narrative assessment required by SSR 96-8p in formulating the RFC, and Ms. Chaney's argument to the contrary is without merit.

*2. Treating Physician's Opinions*

Next, Ms. Chaney contends that the ALJ erred as a matter of law in evaluating the medical opinions of her treating physicians, Drs. Ramdass and Farah, in violation of the "treating physician rule." In his written decision, the ALJ evaluated the opinions as follows:

> In an undated report, Dr. Roland Ramdass concluded that the claimant would be able to stand/walk for less than 30 minutes and sit for less than one to two hours on a continuous basis until experiencing interruption due to pain, and would be able to alternate between sitting and standing on a consistent basis thought [sic] an eight-hour workday with customary breaks without experiencing interruption due to pain. He further noted that at the time of the report the claimant was still recuperating from surgery. The opinion of Dr. Ramdass is accorded little weight, as this post-surgical report is inconsistent with the medical evidence of record including treatment records from Dr. Ramdass and the objective findings of consultative medical examiner Dr. Webb.
>
> In a medical source statement dated November 29, 2012, Dr. Ramsay Farah opined that independent from any alcoholism/drug addiction, the claimant has no significant loss of ability to some loss of ability regarding the area of understanding and memory; no significant loss of ability to extreme loss of ability regarding the area of sustained concentration and persistence; no significant loss of ability to serious loss of ability regarding the area of social interaction; and some loss of ability to serious loss of ability regarding the area of adaptation. The opinion of Dr. Farah is accorded little weight, as this opinion is

> inconsistent with the medical evidence of record, including treatment
> records from Dr. Farah reflecting conservative, outpatient treatment
> for her mental impairments.

(R. 25.)  Ms. Chaney argues that the ALJ failed to evaluate whether the opinions should be given controlling weight in accordance with the factors laid out in SSR 96-2p. In addition, she contends that apart from the controlling weight analysis, the ALJ failed to properly apply the required criteria for weighing medical opinions in deciding to accord the opinions little weight. The Commissioner, on the other hand, asserts that "the ALJ examined the opinions in light of the record as a whole, and reasonably afforded them little weight."

A treating source medical opinion must be given controlling weight when all of the following are present: (1) the opinion comes from a treating source; (2) the opinion is about the nature and severity of the claimant's impairments; (3) the opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques; and (4) the opinion is not inconsistent with other substantial evidence in the case record. SSR 96-2p; 20 C.F.R. §416.927(d)(2). "By negative implication, if a physician's opinion is not supported by clinical evidence or if it is inconsistent with other substantial evidence, it should be accorded significantly less weight." *Craig v. Chater*, 76 F.3d 585, 590 (4th Cir. 1996); *see also Mastro v. Apfel*, 270 F.3d 171, 178 (4th Cir. 2001) ("Under such circumstances, the ALJ holds the discretion to give less weight to the testimony of a treating physician in the face of persuasive contrary evidence.").

However, "a finding that a treating source medical opinion is not well-supported by medically acceptable clinical and laboratory diagnostic techniques or is inconsistent with the other substantial evidence in the case record means only that the opinion is not entitled to 'controlling weight,' not that the opinion should be rejected. Treating source medical opinions are still entitled

to deference and must be weighed using all of the factors provided in 20 CFR 404.1527 and 416.927. In many cases, a treating source's medical opinion will be entitled to the greatest weight and should be adopted, even if it does not meet the test for controlling weight." SSR 96-2p Thus, if the ALJ determines that a treating source opinion is not entitled to controlling weight, the ALJ must then evaluate and weigh the opinion by applying the following factors: (1) whether the physician has examined the applicant; (2) the treatment relationship between the physician and the applicant; (3) the supportability of the physician's opinion; (4) the consistency of the opinion with the record; (5) whether the physician is a specialist; and (6) any other factors which tend to support or contradict the opinion. 20 C.F.R. § 404.1527(d)(2); 20 C.F.R. § 404.1527(c). The ALJ must give good reasons for the weight given to a treating source's opinion. 20 C.F.R. § 416.927(c)(2). Specifically, the decision "must contain specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." SSR 96-2p.

Ms. Chaney contends that the ALJ "failed to evaluate whether the opinions of Drs. Ramdass and Farah should be accorded controlling weight" because "he did not consider whether these opinions were medical opinions, whether they came from a treating source, or whether they [were] well-supported by medically acceptable clinical and laboratory diagnostic techniques." Additionally, Ms. Chaney contends that, apart from the controlling weight analysis, the ALJ failed to mention five of the six 20 C.F.R. § 404.1527(c) factors in deciding what weight to give the opinions and that, while the ALJ did mention that the opinions of Drs. Ramdass and Farah were inconsistent with other evidence of record, "he failed to specifically identify the inconsistencies to

which he was referring, other than to generally find that their opinions were inconsistent with the medical evidence of record." The undersigned finds that these arguments lack merit.

First, it is clear from the record that the ALJ appropriately declined to assign controlling weight to the opinions. The ALJ started his analysis of the evidence by stating that he "considered opinion evidence in accordance with the requirements of 20 CRF 404.1537 and 416.927 and SSRs 96-2p, 96-5p, 96-6p and 06-3p." Thus, he was aware of the correct legal standards governing his consideration of opinion evidence. *See Tucker v. Astrue*, 897 F.Supp.2d 448, 468 (S.D.W.V. Sept. 27, 2012) (finding similar statement evidence that ALJ "complied with the governing mandates in his consideration of the opinions"); *Strickland v. Astrue*, 2011 WL 4021156 (S.D.W. Va. Sept. 9, 2011) ("[I]t is notable that in his decision the ALJ explicitly states that he considered opinion evidence in accordance, *inter alia*, with 20 C.F.R. §§ 404.1527 and Social Security Ruling 96–2P, a fact which leaves no doubt that he was mindful of the correct legal standards in reaching his decision.").

Next, before discussing and assigning weight to the medical opinions, the ALJ undertook a lengthy and detailed analysis of the objective medical evidence. The ALJ specifically noted that Ms. Chaney "received treatment for her bilateral foot and right ankle impairments from...Doctor of Podiatric Medicine, Roland Ramdass" and that she "received treatment for her mental impairments from...Dr. J. Ramsay Farah." The ALJ also expressly identified the opinions as being from "treating sources" indicating that he was aware these were treating-source opinions. Throughout the analysis, the ALJ repeatedly referenced the doctors' treatment notes and highlighted several instances where their treatment records and other medical evidence contradicted their opinions. Moreover, the ALJ's detailed analysis of the evidence as a whole highlights the inconsistencies between the opinions as

to Ms. Chanye's limitations and the other medical and testimonial evidence. For example, the ALJ noted that x-rays and ultrasounds of Ms. Chaney's feet were normal in April of 2011 and September of 2012 and that she exhibited good right ankle stability and improved right joint alignment and range of motion following her surgery. Thus, it is clear from the ALJ's written decision that the ALJ declined to give the opinions controlling weight because of their inconsistencies with the record evidence.

Additionally, the undersigned finds that the ALJ properly weighed the opinions in accordance with the regulations. Although Ms. Chaney is correct that the ALJ did not specifically indicate how he considered and applied each of the factors in 20 CFR 416.927, neither the regulations nor applicable case law require the ALJ to specifically discuss each factor in such a mechanical fashion. All that is required by the regulations is that the ALJ provide an explanation for the weight he assigns to a medical opinion that is "sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." SSR 96-2p; *see also Oldham v. Astrue*, 509 F.3d 1254, 1258 (10th Cir. 2007) ("That the ALJ did not explicitly discuss all the § 404.1527(d) factors for each of the medical opinions before him does not prevent this court from according his decision meaningful review. [Claimant] cites no law, and we have found none, requiring an ALJ's decision to apply expressly each of the six relevant factors in deciding what weight to give a medical opinion."); *Strickland v. Astrue*, 2011 WL 4021156 (S.D.W. Va. Sept. 9, 2011) (succinct explanation is legally sufficient "when considered in the context of the ALJ's entire decision" and the specific reasons given "correlate directly to several of the factors specified in [the] regulations"); *Wiltz v. Commissioner of Social Security Admin.*, 412 F.Supp.2d 601, 608 (E.D. Tex. Dec. 20, 2005) ("[20 C.F.R.

416.927(d)] requires only that the adjudicator 'consider' the factors. Neither the regulation nor interpretive case law requires that an ALJ specifically name, enumerate, and discuss each factor in outline or other rigid, mechanical form. Thus, mindful of a general duty of deference to the Commissioner's decisions, reviewing courts should examine the substance of an ALJ's decision, rather than its form.").

Here, as discussed above, the ALJ specifically noted that he was aware of the correct legal standards governing his consideration of opinion evidence. When evaluated in context with the entire decision, the ALJ's explanation for the weight he gave the opinions is "sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." SSR 96-2p. The ALJ expressly indicated that he gave both opinions "little weight." Moreover, it is clear from the record that the ALJ recognized that Dr. Ramdass and Farah were treating sources and that they had an extensive treatment relationship with Ms. Chaney. It is equally clear that the ALJ examined the consistency of the opinions with the rest of the record. In fact, the ALJ specifically enumerates the opinions' contradictions with the record evidence as one of the reasons for assigning it only little weight. Ms. Chaney's contention that the ALJ "failed to identify the inconsistencies to which he was referring" lacks merit. In fact, the ALJ very specifically noted the contradictory evidence while discussing the respective opinions, as well as during his lengthy and detailed discussion. The ALJ provided good reasons in his decision for the weight he gave to the treating sources' opinions. Nothing more was required.

*3. Concentration, Persistence, or Pace Limitations*

Finally, Ms. Chaney contends that the ALJ failed to account for her moderate difficulties in concentration, persistence, or pace in assessing her mental RFC, even though the ALJ specifically

found that she had such difficulties. The Commissioner argues that the ALJ did not simply limit Ms. Chaney to unskilled work, but rather posited specific limitations to the VE, and in the RFC, that reasonably account of all of Ms. Chaney's established mental limitations.

Ms. Chaney's final argument lacks merit. She cites to *Stewart v. Astrue*, 561 F.3d 679, 684-85 (7th Cir. 2009), to support her position. However, in *Stewart*, the Court held that a hypothetical limiting a claimant to simple tasks did not adequately account for deficits in concentration, persistence, or pace, because it "failed to include restrictions on, for example, the ability to understand instructions or respond to work pressures." *Id*. Here, in contrast, the ALJ did not simply limit his hypothetical, or his RFC assessment, to simple, unskilled tasks. Instead, he included very specific limitations on concentration, persistence, or pace, such as (1) the ability to understand, remember, and carry out simple instructions; (2) goal-oriented jobs with minimal work-setting changes; and (3) minimal interaction with others. Thus, contrary to Ms. Chaney's argument, the ALJ fully accounted for limitations in the ability to understand instructions, respond to work-pressures, and other documented concentration deficits. *See Parker v. Astrue*, 792 F.Supp.2d 886, 895-96 (E.D.N.C. 2011) (finding meritless the plaintiff's argument that limiting the plaintiff to simple, routine, and repetitive tasks with no quota-based or production work did not adequately account for his moderate concentration difficulties and collecting cases).

## IV. RECOMMENDATION

In reviewing the record, the Court concludes that the ALJ's decision was based on substantial evidence, and **RECOMMENDS THAT**:

1.      Ms. Chaney's Motion for Summary Judgment be **DENIED**; and

2.      Commissioner's Motion for Summary Judgment be **GRANTED** for the reasons set forth.

Any party who appears *pro se* and any counsel of record, as applicable, may, within fourteen (14) days after being served with a copy of this Report and Recommendation, file with the Clerk of the Court written objections identifying the portions of the Report and Recommendation to which objection is made, and the basis for such objection. A copy of such objections should be submitted to the District Court Judge of Record. Failure to timely file objections to the Report and Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such Report and Recommendation. 28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985): *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984), *cert. denied*, 467 U.S. 1208 (1984).


DATED: July 23, 2014                           /s/ *James E. Seibert*
                                               JAMES E. SEIBERT
                                               UNITED STATES MAGISTRATE JUDGE